IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES CROWLEY,** | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 20-6345 |
| | : | |
| **KIRKENDOLL MANAGEMENT LLC** | : | |

McHUGH, J.                                                                                                        December 27, 2021

# MEMORANDUM

This case arises out of the management of a strip club in Philadelphia and involves competing accusations of sexual harassment. Plaintiff James Crowley claims he was unlawfully terminated from his employment as a manager at the Penthouse Club Philadelphia in retaliation for investigating and reporting the Club's general manager for sexually harassing female employees. Defendant Kirkendoll Management responds that it fired Mr. Crowley because of disturbing reports of domestic abuse against a female employee of the Club, which followed an incident where he was accused of smashing of a subordinate female employee's cell phone in an angry outburst.

With discovery complete, Defendant has moved for summary judgment as to all claims. Also before me is Plaintiff's motion to amend the complaint to include three new defendants: Philly Sports Bar, LLC; 3001 Castor, Inc.; and 3001 Castor, LLC. Because I conclude that a factfinder could not reasonably disbelieve Defendant's articulated, legitimate reasons for firing Mr. Crowley, or conclude that Plaintiff's reporting was the "but for" cause of his termination, I will grant Defendant's motion in full. I will also deny Plaintiff's motion to amend the Complaint as futile.

1

I. **Factual Background**

The Penthouse Club Philadelphia was a strip club owned by 3001 Castor Inc. and 3001 Castor LLC (collectively "3001 Castor"). *See* Management Services Agreement, ECF 24-9. 3001 Castor was owned by the individuals Mike Rose, Frank Lubinsky, Anthony Boyle, and Scott Golden. MSA at 11; Crowley Dep. 72:2-73:13. In November 2017, 3001 Castor entered into two agreements with Philly Sports Bar LLC: a Management Services Agreement ("MSA") and an Asset Purchase and Sale Agreement. *Id.*; Spratt Decl. ¶ 7, ECF 24-8. The MSA gave Philly Sports Bar control over operations of the Club. According to Defendant, the deal was structured so that as manager for a period of time prior to purchase, Philly Sports Bar would be able to knowledgably assess the value of the business before finalizing the sale. Spratt Decl. ¶¶ 9, 11. The transaction was never finalized, and the Club closed in early 2019. *Id.* ¶ 13.

Defendant Kirkendoll Management was also involved in these transactions. According to Defendants, Kirkendoll's involvement was limited to holding the purchase documents in escrow until the sale was finalized. Spratt Decl. ¶ 10. Plaintiff, however, points to several items in the record to show that their business dealings were significantly intermingled. Most notably, Kirkendoll Management and Philly Sports Club share both ownership and employees. Both are owned by John Kirkendoll and Pieper Kirkendoll. Kirkendoll's Factual Responses to PCHR Request ¶¶ 1-2. They shared several employees or contractors including Chuck Rolling, the Chief Operating Officer of both Philly Sports Bar and Kirkendoll Management, who Defendant notes "has managed business operations for Kirkendoll Management and/or its affiliates for nearly thirty years," Def. Br. at 5; Rolling Dep. 9:17-10, ECF 25-3, and IT developer Alex Change, Penthouse Club App Details, ECF 25-11. The President of Kirkendoll Management, Tim Spratt, attested to doing "nothing" for Philly Sports Bar. Spratt Dep. 19:16-18, ECF 25-4. But, as Plaintiff points

out, Spratt visited the Club several times for the purpose of "diligencing the acquisition," *id.* 20:7-18, regularly received earning statements about the Club, *id.* 29:12-16, and was involved in the discussion to shut down the Club, *id.* 24:13-18. Finally, Plaintiff includes in the record evidence that Defendant Kirkendoll Management held itself out publicly as the entity that was purchasing the Club. Press Releases, ECF 24-5.

Plaintiff James Crowley began working at the Penthouse Club Philadelphia in October 2016 as a bouncer. Crowley Dep. 30:24-31:1, ECF 25-2. Approximately one year later, he was promoted to a manager role, which included oversight of other employees. *Id.* 34:25-37:14. All of Plaintiff's paychecks when he was employed at the Club were from 3001 Castor, Inc. Pay Stubs, ECF 24-12.

Throughout June and July 2018, Plaintiff participated in the reporting and investigation of claims of sexual harassment brought by several female employees of the Club related to the conduct of general manager Edgar Gill. Crowley Dep. 78:4-79:10. Plaintiff received complaints from the employees under his supervision and passed them on to Cassie Jian, then Marketing Director for the Club. *Id.* 78:10-79:2; Rolling Dep. 43:17-20. The complaints were related to a series of extremely disturbing text messages that Gill sent to the female employees. Text Messages, ECF 25-7. Ms. Jian then passed the complaints on to Chuck Rolling, COO of Philly Sports Bar. Crowley Dep. 78:18-79:2; Rolling Dep. 43:17-20. After receiving the complaints, Chuck Rolling came to Philadelphia to conduct an investigation, which involved interviews with the employees, as well as an interview with Crowley. Crowley Dep. 87:5-9. As a result of the initial investigation, and despite the extremely troubling nature of the messages, Gill was not immediately fired but was reprimanded and given an ultimatum that if he continued sending such texts he would be fired. *Id.* 87:10-22; Rolling Dep. 47:12-22; Rolling Decl. ¶ 8, ECF 24-4. Around

this time, Rolling learned that Crowley had been involved in an altercation with a female employee under his supervision whose phone he smashed. Rolling Decl. ¶ 10; Rolling Dep. 66:8-14. He also learned that Crowley was romantically involved with Sarah Rothrock, one of Crowley's subordinates. Rolling Decl. ¶ 10; Rolling Dep. 33:9-23. In response to this information, Rolling directed Gill to move Crowley from the night shift to the day shift so that he no longer would supervise either the employee whose phone he broke or the employee with whom he was romantically involved. Rolling Decl. ¶ 10; Rolling Dep. 33:9-23.

A little over a month later, on September 7, 2018, Defendant received an email from Stephani Rothrock, the mother of Sarah, the young woman with whom he was romantically involved. ECF 24-5. The email alleged in detail that Crowley physically abused Sarah, damaged her property, and was manipulating Sarah to turn her against her family. *Id.* It also alleged that Crowley was threatening Sarah's mother, and that Crowley had an extensive criminal history. *Id.* A few days later, and after consulting with Mike Rose of 3001 Castor, Rolling decided to fire Crowley and instructed Gill to carry out the termination. Rolling Dep. 49:14-50:7, Rolling Decl. ¶¶ 16-17.[1]

Following Plaintiff's termination, certain additional events occurred that the parties contend are circumstantially relevant to the key allegations. First, on September 24, 2018, Rolling took the seemingly long overdue step of firing Gill after viewing "some previously-unseen text messages." Rolling Decl. ¶ 9. After that, on September 28, 2018, Rolling finally ran a background check on Crowley that revealed several prior misdemeanor convictions for assault, stalking, and harassment. ECF 24-6. Throughout the last weeks of September, Crowley communicated with

---

[1] The parties seem to dispute whether the firing took place on September 9, 2018 (per Crowley), or September 11, 2018 (per Kirkendoll), but the two days do not make a difference in the analysis. Both dates follow closely after the email from Ms. Rothrock.

Rolling via text message, which included sending him several rambling messages about his belief that he was fired for reporting Gill's harassment. ECF 24-7. At his deposition Crowley denied remembering any of these texts. Crowley Dep. 152:1-4. Finally, in October 2021, Crowley married Sarah Rothrock. *Id*.

## II. Legal Standard

The parties' motions for summary judgment are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

## III. Discussion

### A. Defendant's Motion for Summary Judgment

Plaintiff contends that he was demoted and later fired in retaliation for reporting female employees' claims of sexual harassment by a supervisor in violation of Title VII. "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (cleaned up). "If the employee establishes this *prima facie* case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."

*Id.* at 342 (cleaned up). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (Becker, J.) (internal citations omitted).

Defendant Kirkendoll makes three arguments as to why it is entitled to summary judgment based on the record: (1) Kirkendoll was not Plaintiff's employer, which is a necessary element of a Title VII case; (2) Plaintiff's job duties as a manager included reporting sexual harassment and therefore his reporting was not a protected activity; and (3) Defendant had legitimate reasons for firing Plaintiff and Plaintiff is unable to show that the reasons were pretextual. At present, I find that the Plaintiff has presented sufficient evidence in the record to establish genuine issues of material fact as to the first two arguments. Therefore, for the purposes of this opinion, I assume that Kirkendoll is appropriately named as a defendant and that Plaintiff has made out a *prima facie* case of retaliation, because he engaged in a protected activity by reporting the sexual harassment complaints and he was demoted and later fired following that activity.

Since I assume for the purposes of this motion that Plaintiff can establish a *prima facie* case, the Defendant now has the burden of proffering legitimate, non-retaliatory reasons for the adverse employment actions. With respect to the demotion to day shift, Defendant claims that Crowley was moved to the day shift to separate him from supervising two particular female employees, one whose phone he "smashed" in an "outburst" and another with whom he had a romantic relationship. Rolling Decl. ¶ 10. Defendant represents that it then terminated Crowley in response to the email sent by his girlfriend's mother, which accused Crowley of physical and psychological abuse of her daughter, as well as the prior violent outburst that had allegedly

6

occurred a couple months prior. Rolling Decl. ¶ 17.[2] Taken together, these reasons can be viewed as Rolling being "concerned about the safety of the employees" of the Club, Rolling Decl. ¶ 16, which is a legitimate reason to discipline or terminate an employee. *See Grier v. Philadelphia Hous. Auth.*, CIV. A. 93-5625, 1995 WL 80096, at *5 (E.D. Pa. Feb. 27, 1995).

Defendant having met this "relatively light burden" of providing a legitimate reason for the adverse actions, the burden of production shifts back to the plaintiff who must show that each of the employer's reasons are pretextual. *Fuentes*, 32 F.3d at 763. To demonstrate pretext and defeat summary judgment, the plaintiff must identify evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764. "[T]he plaintiff must convince the factfinder '*both* that the reason was false, *and* that [retaliation] was the real reason.'" *Id.* at 763 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis in original). Thus, under the balance shifting framework here, the burden on the plaintiff is more than simply raising a genuine dispute of material fact over the prima facie case itself. Plaintiff must submit evidence to discredit Defendant's proffered legitimate reasons for the termination. "[T]he plaintiff cannot rely on a showing that 'the employer's decision was wrong or mistaken' because the focus of the factual dispute is 'whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Pamintuan v. Nanticoke Meml. Hosp.*, 192 F.3d 378, 386 (3d Cir. 1999) (quoting *Fuentes*, 32 F.3d at 765). "This means that the plaintiff must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

---

[2] Defendant suggests that "suspicion of theft" was another reason that Plaintiff was fired, but there is nothing in the record supporting this suspicion except for Defendant's declaration. Rolling Decl. ¶ 15.

7

employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Pamintuan v. Nanticoke Meml. Hosp.*, 192 F.3d 378, 386 (3d Cir. 1999) (quoting *Fuentes*, 32 F.3d at 765) (cleaned up).

With respect to the demotion, Plaintiff's position largely hinges on a "similarly situated" argument: whereas Gill was (at first) merely reprimanded for the sexual harassment of the female employees, Plaintiff was demoted to a less lucrative day-shift position in response to allegations of destroying the cell phone of one subordinate and being romantically involved with another. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) (noting that "identification of a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably, may give rise to an inference of unlawful discrimination"). Although the facts in the record certainly paint a picture of a business run with seemingly little regard for the health and well-being of its employees,[3] the fact that Gill was merely reprimanded where Crowley was demoted is insufficient on its own to show the type of inconsistency necessary to raise an inference of pretext. Switching Crowley to the day shift served the legitimate purpose of protecting other specific employees towards whom Plaintiff had allegedly behaved inappropriately, by removing them from his supervision. It is not clear that any such option existed to isolate Gill from the employees that he harassed, and Gill was at least provided an ultimatum to stop such texting or face termination. Regardless, Crowley's and Gill's positions were not so similar here either with respect to the remedial options available or, perhaps more saliently, with

---

[3] In addition to its initial slap on the wrist of Gill for a pattern of sending inappropriate, sexually explicit and predatory texts to his much younger female subordinates, the business—while operating as a strip club where sexual harassment presents itself as an obvious institutional risk for employees— "did not have a written sexual harassment policy," Def. Br. at 3. Furthermore, as shown by the later background check of Crowley undertaken after his termination, it hired individuals with criminal convictions for sexual harassment and stalking to manage its employees.

respect to the conduct they were purportedly punished for. The truly comparable co-worker for Crowley is Ms. Jian, who investigated the complaints and reported to Rolling. Crowley cites no evidence to suggest that she received any discipline at all for her participation in the investigation. Thus, while Defendant's initially weak discipline of Gill may not have been "wise, shrewd, prudent or competent," *Fuentes*, 32 F. 3d at 765, it does not support an inference of pretext where Defendant made a reasonable decision to separate Crowley from employees that he could no longer competently manage and did not discipline anyone else involved in the reporting and investigation.

Plaintiff further claims that the entire event about the broken phone was concocted by Gill, whom he also claims harbored a grudge against him. Crowley Dep. 115:9-119:17. As an initial matter, if the motive were personal, it would not be retaliatory. Although Gill was the one who reported the smashed cell phone to Rolling, he made the report at the request of an employee whom it appears was among those who had earlier complained to Crowley about Gill. Crowley Dep. 121:13-122:6; Rolling Dep. 46:23-47:4. Logically, the scenario Plaintiff advances would require a conspiracy between Gill and the employee to contrive the event, first to buy the employee a new phone to replace an old phone, Crowley Dep. 116:16-117:14,[4] and then stage its smashing as an excuse to get Crowley fired, Crowley Dep. 119:1-120:19. But even assuming this improbable conspiracy, it doesn't show that Rolling, who made the decision to fire Crowley, did so pretextually, because it fails to raise an inference that Rolling *himself* participated in the conspiracy. Rolling was acting on the report of his general manager and another employee, the veracity of which he weighed against Crowley's own account. Though Crowley may, then and

---

[4] Crowley discusses this early in his, at times incoherent, text messages to Rolling where he notes that "I really didn't wsnt yo do this especially cause your GM [Gill] has a sick crush on [the employee] and he made her choose me or the club. … So save the broken phone excuse cause [Gill] paid her with company and she took it that was his fault … ." ECF 25-7 at KM-CROWLEY_0070 (uncorrected).

9

now, dispute the credibility of the allegations and the wisdom of Rolling's decision, such a dispute does not raise an inference of pretext, just disagreement. Thus, based on the record, no reasonable juror could infer retaliatory animus was more likely than not motivating Rolling in making the decision to fire Plaintiff.[5]

Plaintiff's arguments that the record reasonably supports an inference that Defendant's termination of his employment was pretextual are even less convincing. As shown by Plaintiff's own text messages, Defendant's proffered reasons for firing Crowley—the smashed phone incident and the email from Sarah's mother—were made clear to Crowley *at the time* of his termination. On September 28, 2018, around two weeks after the firing, Crowley texted Rolling that, "I know [the employee with the alleged broken phone] cleared up that excuse you tried using and I'm with Sarah now she is gonna prove her mom is crazy so there goes that excuse so I was fired for helping girls being harassed n assaulted I wanna see what more lies you try to tell about me to cover this up." ECF 24-7 at KM-CROWLEY_078 (uncorrected).[6] The fact that these

---

[5] Plaintiff does not formally argue a "cat's paw" theory, where he would seek to "hold his employer liable for the animus of a non-decisionmaker." *McKenna v. City of Philadelphia*, 649 F.3d 171, 177 (3d Cir. 2011). But such a theory would not succeed. Even if Crowley's testimony that he didn't break the phone was true, such that Gill and the employee invented the story out of whole cloth, Rolling's independent investigation of the incident, including his communications with Crowley, as well as Crowley's admitted romantic involvement with Sarah, who is now his wife, show that Rolling did not solely "rely on the 'supervisor's biased report' in taking the ultimate adverse action." *Jones v. S.E. Pa. Transp. Auth.*, 796 F.3d 323, 331 (3d Cir. 2015). With respect to the termination, a "cat's paw" theory is further undermined by the fact that Sarah's mother's email was received two to four days before the termination, providing an independent ground for the firing.

[6] At Plaintiff's deposition, he denied remembering this and almost every other text sent from his number at that time including this one. Crowley Dep. 151:18-152:4. In Rolling's affidavit, he authenticates the text messages by attesting to having downloaded them from his cell phone and having identified Crowley as the sender both by the content of the messages and by the fact that Rolling spoke with Crowley via telephone call at that number. Rolling Decl.¶¶ 26-27. The Court finds no reason to doubt the authenticity of the text messages, especially in light of Plaintiff's affirmative use of them in his own brief. Pltf. Br. at 18. Crowley's inability to remember them at his deposition does not go to their authenticity, but to Crowley's credibility.

reasons were offered contemporaneously weighs strongly against any inference of pretext and effectively rules out the possibility that the reasons proffered were post-hoc fabrications.

Plaintiff is left with the task of marshalling evidence to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765.  Plaintiff's key argument here is that Stephanie Rothrock, Sarah's mother, had been in touch with Rolling to complain about Crowley prior to the email, and Crowley and Rolling had communicated about Ms. Rothrock previously, such that the email itself should have come as no surprise to Rolling.  In Plaintiff's view, it follows that the email cannot have been the real basis of Rolling's decision.  *Id.* 97:2-24; Crowley Decl. ¶¶ 3-6.  Plaintiff attempts to suggest some inconsistency in Defendant's conduct: not firing Crowley on the basis of phone calls but doing so when the medium of communication shifted to emails.[7]  But given the seriousness of the allegations contained in the email, as well as the fact that it was sent to a superior of Rolling's within Kirkendoll Management, this is not the type of inconsistency that could lead a "reasonable factfinder to conclude that the *employer's proffered reason for the [termination] was a lie.*" *Bray v. Marriott Hotels*, 110 F.3d 986, 1000 (3d Cir. 1997), (Alito, J., dissenting) (emphasis in original).  In context, with Gill's termination following only two weeks later, it is implausible that the appearance of the email simply provided a convenient pretext for Rolling's "true" purpose

---

[7] Plaintiff also mounts a global attack on the credibility of the allegations of abuse, on the ground that his later marriage to Sarah Rothrock disproves them. Pltf. Br. at 37.  This fails on several levels.  First, even long-term relationships can be marred by incidents of abuse.  Second, the marriage was recent, and the events at issue occurred during the summer of 2018.  The current relationship between Mr. Crowley and his wife sheds no light on Rolling's thought process when he made the decision to terminate Crowley.  Finally, if post hoc evidence were to be deemed relevant in assessing Rolling's prior judgment—and it is not— the belated background check into Crowley's criminal record, which revealed criminal misdemeanor convictions for assault, sexual harassment, and stalking, would constitute additional, objective evidence that there was a legitimate, non-pretextual reason for the firing.

of punishing Crowley in retaliation for outing Gill. If, as Plaintiff alleges, Kirkendoll was anticipating litigation with Gill, it would in fact have been an inopportune time to sever ties with Crowley, who would otherwise have been a friendly witness against Gill. Against this backdrop, and in combination with the allegations about the smashed phone, the email speaks for itself and provides an independent cause of termination due to the seriousness of its allegations.[8] Given that the email is the culmination of a series of escalating phone calls made by the mother, it does not create a suspicion of pretext.

Viewed in broad terms, Rolling operated a strip club that employed many young women in a setting rife with risk for harassment or abuse. When Rolling received the harassment complaints about Crowley, it was coming on the heels of recent, similar complaints about Gill, (ironically forwarded by Crowley.) Even if the allegations made against Crowley weren't yet formally verified, and even though they were disputed by Crowley, the financial risk to the Club and the physical risk to its employees were matters of legitimate concern. Set in this context, the inconsistencies suggested by Plaintiff—the delay in firing Gill and the timing of Ms. Rothrock's

---

[8] The body of the email in full:

> I believe you are in charge of risk management. My 19 year old daughter was working at one of the clubs owned by your company. The assistant manager began a relationship with her, and I need this to be addressed. This man is over 40, and recently hit my daughter which gave her a black eye, and multiple bruises on her body. He also smashed her phone and laptop computer. He has manipulated her and planted ideas in her head that her family does not love her or care about her, and that he is the only one who will protect her. He has gone into her personal file and found my contact information as her emergency contact, and has been texting me relentlessly. He has continually texted her even though I have taken her new phone away at this point. He has threatened to harm me in messages to my daughter and now I do not feel safe in my home since he knows my address. The police are unable to do anything, since he has manipulated my daughter and she won't file a PFA, but they have informed me that this man has an extensive criminal history. I believe he has done this to other young girls and have contacted NOVA and their Human Trafficking advocate has become involved. If your organization will not address this and have this man back off and stay away from my daughter and our family, I will report the club to Attorney General's office. ECF 24-5.

As noted above, these allegations about Mr. Crowley's criminal record were accurate.

email—are not of such a nature that a reasonable jury could infer that Defendant's expressed concern for the safety of its employees was a pretext for an underlying retaliatory animus. Defendant's motion for summary judgment as to the Title VII retaliation claim will therefore be granted. Further, because his claims under Title VII fail, his corresponding claims under PFPO also fail. *See Claiborne v. SEPTA*, CV 19-3011, 2021 WL 5298981, at *12 (E.D. Pa. Nov. 15, 2021) (citing cases and noting that claims under PFPO are reviewed under the same burden-shifting analysis as Title VII).

    B. Plaintiff's Motion to Amend

Plaintiff seeks to amend to add the 3001 Castor entities and Philly Sports Bar as Defendants. As discussed above, Chuck Rolling made the final decision to terminate Crowley, and he did so for legitimate reasons which are no more susceptible to pretext challenges than if he were an agent of these other entities. Amendment would therefore be futile.

## IV.   Conclusion

Defendant's motion for summary judgment is granted in full and Plaintiff's motion to amend is denied. An appropriate order follows.

                                           /s/ Gerald Austin McHugh
                                           United States District Judge